**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

| | |
|---|---|
| In re<br><br>**R & D DEVELOPMENT REALTY, LLC,**<br><br>Debtor | **Chapter 11<br>Case No. 09-21771-FJB** |

**MEMORANDUM OF DECISION ON
MOTION OF TD BANK, N.A. FOR RELIEF FROM THE AUTOMATIC STAY**

This chapter 11 case is before the court on the second motion of TD Bank, N.A. (the"Bank") for relief from the automatic stay, this time exclusively under 11 U.S.C. § 362(d)(3), to exercise its rights as mortgagee with respect to the debtor's real estate. On the Bank's first motion, it requested and obtained, on January 26, 2010, an order determining that the debtor's real estate constitutes "single asset real estate" as that term is defined in 11 U.S.C. § 101(51B) and used in § 362(d)(3). By virtue of this determination, and in order to avert creating cause for relief from the stay under subsection (d)(3), the debtor, R & D Realty Development, LLC (the "Debtor"), became obligated to, within thirty days after such determination, either (i) file a plan of reorganization that had a reasonable possibility of being confirmed with a reasonable time or (ii) commence monthly payments of interest at the nondefault contract rate on the value of the Bank's interest in the real estate. 11 U.S.C. § 362(d)(3). The Debtor has not filed a plan but did timely commence payments. The Bank nonetheless contends that it is entitled to relief under subsection (d)(3) because the payments are inadequate, being based on a value of $600,000, which is a fraction of the $2,100,000 that the Bank contends is the property's fair market value,[1] and because the debtor has tendered only three such payments, not the full five that by now have come due.

---

[1] The parties do not disagree as to the applicable interest rate, only as to the value to which it must be applied.

**Valuation**

After an evidentiary hearing on the motion, the Court begins with the only factual issue issue, that of the value of the property. The parties agree that the debt to the Bank greatly exceeds the value of the property and that the Bank's mortgage is the first priority lien on the property. Therefore, under 11 U.S.C. § 506(a), the value of the Bank's interest in the property is the value of the property itself. For purposes of determining "the value of the creditor's interest in the real estate" under § 362(d)(3)(B), where the Debtor proposes to retain the property—in part to operate as a golf course and in part to develop and sell adjacent residential properties at fair market value—the appropriate measure of value is fair market value. *In re Winthrop Old Farms Nurseries, Inc.*, 50 F.3d 72 (1st Cir. 1995) (in determining value of secured creditor's interest in an estate asset, standard of valuation of collateral is flexible and should conform to the purpose of the valuation and the proposed use or disposition of the property). The ultimate burden of proof as to all issues under § 362(d)(3)(B) is on the Debtor. 11 U.S.C. § 362(g)(2). However, where the creditor contends that the value of the property is higher than the value that debtor concedes, the burden is on the creditor to come forward with evidence of that higher value.

The property in question, which the Debtor exists to develop, is a combination golf course and residential real estate development in Methuen, Massachusetts. The project as currently envisioned would include an 18-hole golf course, 20 single-family homes, and 55 condominium units. The project is far from complete. Of the 207 acres that comprise the planned development, some 78.1 acres has not yet been acquired by the Debtor. Approximately 53 of those acres are controlled by Robert Nazarian; Nazarian and his wife are the Debtor's sole equity holders. The remainder is owned by the Town of Methuen and Massachusetts Electric Company. The missing acreage is necessary for development of some of the condominium units—the evidence does not indicate how many—and for completion of the golf course. The golf course itself has not been developed, the Debtor does not have the

2

financial wherewithal to develop it, and, as the Bank's appraiser testified, it is not financially feasible for anyone to develop it at present, at least not profitably. That is, there is at present no market for anyone to acquire it with the intent of developing it as a golf course. No condominium units have yet been developed. Of the 20 single-family home lots, 15 have already been sold, leaving only five. Of these, two are subject to life estates and therefore are deemed to have no value to the Debtor or any potential developer. The Debtor has an offer from a home building contractor to purchase the remaining three for $150,000 each.

The ability of the Debtor or of any potential developer to develop the remaining condos and single family lots is subject to permitting limitations imposed by the Methuen zoning bylaws (the "Bylaws"), especially the sections applicable to Residential Golf Course Development ("RGCD"), which were developed precisely for this project. In relevant part, these obligate anyone seeking an RGCD permit to secure its obligation to complete the golf course by

> [e]ntering into an agreement with the City [of Methuen] that no more than one-half of the units shall be issued building permits nor more than 50% of those shall receive occupancy permits prior to substantial completion of the golf course. No building permits shall be issued for the remaining 50% of the residential development until such time as the golf course is either substantially completed or bonded[.][2]

The Debtor had a total of seventy potential units. Until substantial completion or bonding of the golf course, this bylaw limits the Debtor to thirty-eight building permits and only nineteen occupancy permits. Sale of a unit requires both a building permit and an occupancy permit—no one would purchase a lot or unit they could not both build and occupy. Therefore, the Debtor may at most sell nineteen of its lots or units, of which it has already sold fifteen, leaving only four that it can sell with both permits.

The Methuen Zoning Bylaws give reason to believe that the above permitting restrictions might not apply if, instead of seeking to develop the golf course acreage as a golf course, the RGCD permit applicant were to commit the same acreage to conservation uses. However, this

---

[2] Debtor's Exhibit 1, Methuen Zoning Bylaws, at pp. 88-89.

3

is hardly clear, and it is unlikely that a developer seeking to acquire the Debtor's property would purchase without assurance of the same from the Town of Methuen. No evidence was presented as to the likelihood of obtaining that assurance or as to the amount and cost of legal work that would be necessary to secure it.

The Debtor presented its own opinion of value through a Mr. Lawrence Kady, who is an employee of the Debtor and has served as the manager of this project for the Debtor since its inception. Largely on the basis of the above deed restrictions, he opined that the real estate presently owned by the Debtor has a value of no more than $600,000. He arrives at this figure by attributing a value of $150,000 to each of the three remaining single-family lots, to which the Debtor would allocate building permits and three of the remaining occupancy permits. And, offering no special calculus, he attributes a value of $150,000 to all the remaining land.

The Bank takes the position that the property has a value of $2.1 million. In support of this position, the Bank offered the testimony of appraiser James McCahill, whose firm of MRA, Inc., prepared an appraisal for the Bank as of November 24, 2009. On cross examination, however, McCahill conceded that his firm's appraisal was based on certain false assumptions. Two are critical.

First, the firm assumed that the Debtor had succeeded in acquiring all the land necessary for completion of the project. This was wrong; the Debtor is still missing at least 38 percent of the total acreage. Some of this is land slated for condominium development, and it means that some indeterminate number of the planned condo units cannot be constructed on the Debtor's land. Insofar as McCahill's valuation is based largely on a certain measure of profit per unit sold, this oversight seriously undermines his conclusion. The remainder of the missing land was intended as golf course land. In view of uncertainty about the golf course and possible alternate use of the land as conservation land, it is impossible to know how the absence of the planned acreage might affect (i) permitting decisions for the residential units and (ii) the valuation of residential units where that value was predicated on the dedication of abutting land

4

to either golf course or conservation usage.

Second, the MRA appraisal is based on the assumption that, because the development of a golf course has become financially unfeasible, the golf course land will instead be promptly rededicated to conservation uses, and the Bylaws' permitting restrictions will not pose an obstacle. The validity of this assumption is by no means clear. As written, the Bylaws include the permitting restrictions. These restrictions may indeed fall away, even with relative ease, but at present they constitute a question mark over the ability to develop and market the remaining units. The resulting uncertainty, together with the time and process necessary to overcome it, would depress the potential sale price.

Together these assumptions grossly undermine the MRS appraisal, even as a starting point from which downward adjustments might be made. The Debtor's own position on value, though probably low, is also probably closer to fair market value. There is a great deal of uncertainty about the value of this property. No evidence has been presented as to the value of the property for uses other than the development the Debtor proposes. Nor has either party offered expert testimony on the zoning bylaws and the options available for development. This is not a situation in which the court can, with confidence, pick a middle value between the parties' positions as being a likely value. For present purposes,[3] the evidence preponderates in the Debtor's favor, and for that reason the court fixes the value at $600,000. Accordingly, the Bank's first contention—that the Debtor's monthly payments were insufficient—must be rejected.

**Payments**

The Bank makes only one further argument: that even if the proffered payments were adequate in amount, the Debtor has proffered only three of the five that had come due as of the

---

[3] If the parties remain in disagreement at the time of confirmation, the court will then reconsider value in light of an other evidence the parties may have to offer.

5

date of the evidentiary hearing on this motion, and that this is inconsistent with § 362(d)(3)'s requirement of monthly payments.  The Bank concedes, however, that the Debtor did timely proffer the first payment, and that the Bank rejected that payment and another as insufficient.  The Court holds that where the Debtor proffered payment in an adequate amount and the Bank then put the Debtor on notice that it would not accept such payments, the Debtor had no obligation to proffer any others until notified by the Bank that it would begin accepting them.  In fact, the Debtor did proffer four in all, and the Bank has accepted none.  Three of these were an exercise in futility.

      The Debtor states that it has the wherewithal to bring the Bank current and offers to do so.  This offer obviates any issue as to whether the Debtor need now "cure" for payments previously rejected.  Consistent with its offer, the Debtor shall promptly bring the Bank current and then continue making monthly payments in the amount it has been tendering.  The Court will enter a separate order to that effect and otherwise denying the Bank's motion for relief from stay.

Date: August 3, 2009

                                  Frank J. Bailey
                                  United States Bankruptcy Judge